2009 Ark. 298

**Nathan GILCREASE, Appellant,**

v.

**STATE of Arkansas, Appellee.**

No. CR 08–1058.

Supreme Court of Arkansas.

May 21, 2009.

Bill Luppen, Little Rock, for appellant.

Dustin McDaniel, Att'y Gen., by: Eileen W. Harrison, Deputy Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice.

A Pulaski County jury convicted Appellant Nathan Gilcrease of two counts of capital murder and two counts of kidnapping for the assault, abduction and murder of two young men, Sean Johnson and Monte Johnson. He was sentenced to life imprisonment without parole. Thus, we have jurisdiction over the instant case pursuant to Ark. Sup.Ct. R. 1–2(a)(2) (2008). Appellant raises eight arguments for reversal. Because of double-jeopardy concerns, his fifth point, challenging the sufficiency of the evidence, will be addressed first. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003).

I. *Sufficiency of the Evidence*

At the close of the State's evidence, Appellant moved for a directed verdict on grounds that the State failed to present sufficient evidence to support convictions on the ᴸ₂capital murder and kidnapping charges. Specifically, he argued that Albert Reed and Mariah Powell, the two witnesses who testified against Appellant, were accomplices as a matter of law. The trial court ruled that Albert Reed was an accomplice as a matter of law but submitted the question of whether Mariah Powell was an accomplice to the jury. Appellant argued that the testimony of the accomplices had not been corroborated by independent evidence linking Appellant to the crimes. The circuit court denied Appellant's directed-verdict motion. Following deliberations, the jury found Appellant guilty of two counts of kidnapping and two counts of capital murder.

On appeal, Appellant renews his challenge to the sufficiency of the evidence. Specifically, he asserts that the circuit court erred in denying his motion for directed verdict because his conviction was based upon uncorroborated accomplice testimony. We treat a motion for directed verdict as a challenge to the sufficiency of the evidence. *Boldin v. State*, 373 Ark. 295, 283 S.W.3d 565 (2008). In reviewing a challenge to the sufficiency of the evidence, this court views the evidence in the light most favorable to the State and considers only the evidence that supports the verdict. *Id.* Substantial evidence is that evidence which is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or the other, without resorting to speculation or conjecture. *Id.*

As stated earlier, Appellant was convicted of two counts of kidnapping and two counts of capital murder. Under Arkan-

sas law, a person commits kidnapping if, "without consent, the person restrains another person so as to interfere substantially with the other person's liberty with the purpose of ... (3) Facilitating the commission of any felony or flight after the felony; (4) Inflicting physical injury upon the other person." Ark.Code Ann. § 5–11–102(a) (Repl.2006). A person commits capital murder if "(4) [w]ith the premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person." Ark. Code Ann. § 5–10–101(a)(4) (Repl.2006).

When accomplice testimony is considered in reaching a verdict, Arkansas law provides that a person cannot be convicted based upon the testimony of an accomplice "unless corroborated by other evidence tending to connect the defendant ... with the commission of the offense." Ark.Code Ann. § 16–89–111(e)(1)(A) (Repl. 2005). Furthermore, "corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof." Ark.Code Ann. § 16–89–111(e)(1)(B) (Repl.2005). It must be evidence of a substantive nature since it must be directed toward proving the connection of the accused with a crime and not toward corroborating the accomplice testimony. *Stephenson v. State*, 373 Ark. 134, 282 S.W.3d 772 (2008). The corroborating evidence need not be sufficient standing alone to sustain the conviction, but it must, independent from that of the accomplice, tend to connect to a substantial degree the accused with the commission of the crime. *Id.* The test is whether, if the testimony of the accomplice were completely eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *Id.* The corroborating evidence may be circumstantial so long as it is substantial; evidence that merely raises a suspicion of guilt is insufficient to corroborate an accomplice's testimony. *Id.*

The trial court concluded that Albert Reed was an accomplice as a matter of law. Albert Reed testified that he wanted to "beat up" Monte Johnson because Monte happened to be an ex-boyfriend of Reed's girlfriend Mariah Powell and he suspected them of seeing each other again. Reed further testified that he knew Mariah was taking Monte Johnson and his cousin Sean Johnson to a house on Reck Road where Reed was waiting in the backyard. When he saw Mariah, Sean and Monte drive up to the house in Monte's white Chevrolet and enter the house, Reed went inside the house and walked into the bedroom where Mariah stayed periodically. At that point, he saw Appellant emerge from a bathroom and another man, Cameron Williams, jump out of a closet. Both Appellant and Williams were wearing masks. Appellant was armed with a .22–caliber rifle and Williams had a .38–caliber revolver. As soon as both men appeared, Mariah ran out of the house. According to Reed, he complied when Appellant directed him to call Mariah and tell her not to call the police. Appellant then started questioning Monte about some rims that Monte allegedly possessed. When Reed called out Appellant's name, Appellant became enraged and decided to kill Monte and Sean Johnson. Appellant and Williams ordered both men to strip down. After being duct taped, the victims were placed inside the trunk of Monte's car. Reed then drove Monte's car to Hindman Park while Appellant and Williams followed in Appellant's maroon SUV, which had been parked near the Reck Road house. When they arrived at the park, Reed untaped the victims. As Monte and Sean tried to escape, Appellant and Williams fired several shots at them, killing both men. After the shooting, Reed called Tim Mathis and asked to meet him

at a nearby carwash. Reed wanted Mathis to help him wash Monte's car and then hide it. When Reed and Mathis were at the carwash, both men saw Appellant's maroon SUV leaving the same carwash.

■ Mariah Powell's testimony largely corroborated Reed's testimony except that she testified it was Reed who told her to take Monte and Sean Johnson to the Reck Road house. Appellant argued below that Mariah Powell was also an accomplice as a matter of law. The trial court did not declare her an accomplice as a matter of law, but submitted the question to the jury. For an individual to be an accomplice, he or she must engage in one of the activities articulated in Ark.Code Ann. § 5–2–403 (Repl.2006). It is Appellant's burden to prove that a witness is an accomplice whose testimony must be corroborated. *Bush v. State*, 374 Ark. 506, 288 S.W.3d 658 (2008). In this case, the instruction given to the jury allowed it to determine whether Mariah was an accomplice, but we have no knowledge of whether the jury did in fact make such a determination.

When the evidence is viewed in a light most favorable to the State, Mariah's testimony alone was enough to corroborate Reed's testimony. She testified that, upon her arrival at the Reck Road house with Monte and Sean Johnson, she saw Reed, Appellant, and Williams waiting in the bedroom. According to Mariah, Appellant and Williams were both armed with guns.

Other evidence presented by the State showed that the victims' bodies were discovered in Hindman Park and that the bullets found near the bodies were fired from a .22–caliber rifle and a .38–caliber revolver. Latifah Johnson, who also rode to the Reck Road house with Mariah, Sean and Monte, testified that, after the homicides, she overheard a conversation between Appellant and Williams. According

to Latifah, Williams wanted to buy a .38–caliber revolver from Appellant. She further testified about seeing Appellant's maroon SUV parked near the Reck Road house on the night she went to the house with Mariah, Sean and Monte. Likewise, around midnight that same night, Tim Mathis received a call from Reed to meet him at a carwash located close to Hindman Park. When Mathis drove to the carwash, he saw a maroon SUV pull out of the carwash. The State also elicited testimony from two police officers who had seen Appellant driving a maroon SUV on numerous occasions after the homicides in June 2006. In sum, when all of this evidence is viewed in the light most favorable to the State, it tends to connect Appellant to the commission of the crimes. Based upon the foregoing, we conclude that the circuit court did not err in denying Appellant's directed-verdict motion.

## II. Cross–Examination About Prior Plea Offer

■ For his second point on appeal, Appellant argues that the circuit court erred in not allowing him to cross-examine Albert Reed about the history of a plea offer made by the State in exchange for Reed's testimony. Pursuant to a plea offer by the State, Reed had pled guilty to two counts of first-degree murder with a recommended sentence of sixty years in exchange for his testimony against Appellant and Cameron Williams. The case against Williams went to trial first, and Reed testified against him. Reed, however, refused to testify against Appellant at his trial and sought to withdraw his guilty plea. The circuit court denied the request and sentenced him to two life sentences. Shortly thereafter, Reed changed his mind and offered to cooperate with the State and testify against Appellant. At that point, there was no deal with the State, but Reed

was hoping that his testimony against Appellant would result in a reduced sentence. He testified at Appellant's trial and then petitioned the circuit court for a reduced sentence. The court ultimately denied his petition.

Following voir dire but before opening statements, the State argued that Appellant should not be able to tell the jury about the history of Reed's guilty-plea deal. The circuit court directed Appellant not to mention the prior deal between Reed and the State on grounds of lack of relevancy as he had already been sentenced to life in prison. The State commented in its opening statement that Reed had no incentive to lie because he had gotten two life sentences and had nothing to gain from his testimony and had no deal with the State. Appellant cross-examined Reed as directed by the circuit court, asking only whether Reed was hoping for a reduced sentence from the circuit court. On redirect by the State, Reed acknowledged that there was a sentence and no promise had been made by the circuit court to revisit his sentence. Finally, in its closing statement, the State again argued that, with the court's imposition of two life sentences, Reed had nothing to gain from his testimony. When Appellant gave his closing argument, he argued that Reed was hoping to a get a reduced sentence from the circuit court.

Appellant argues on appeal that he should have been allowed a wide latitude in his cross-examination of an adverse witness, especially in the case of an accomplice. He asserts that the circuit court's ruling and the State's continued argument that Reed had no incentive to lie gave a false and misleading impression, which was extremely prejudicial and violated Appellant's Sixth Amendment right to confrontation.

Evidentiary rulings are a matter of discretion and are reviewed only for abuse of that discretion. *Taylor v. Taylor*, 345 Ark. 300, 47 S.W.3d 222 (2001). An accused should be accorded a wide latitude in cross-examination to impeach the credibility of a witness against him. *Klimas v. State*, 259 Ark. 301, 534 S.W.2d 202 (1976). The latitude of this right of cross-examination is even broader and the court's discretion to limit it is somewhat narrower than in other instances. *Id.* This is particularly so when the witness is, or may be found to be, an accomplice. *Id.* It is generally permissible for a defendant to show by cross-examination anything bearing on the possible bias of the testimony of a material witness. *Id.* This rule applies to testimony given under expectation or hope of immunity or leniency or under the coercive effect of his detention by authorities. *Id.* The test is the expectation of the witness and not the actuality of a promise. *Id.* The right of a defendant to show the bias of a witness does not lie within the court's discretion. *Id.*

In the instant appeal, Reed was cross-examined about his motive and desire to have his sentence reduced as a result of his testimony against Appellant. Therefore, Appellant was allowed to show Reed's possible bias or prejudice. Once the main circumstances showing bias have been admitted, the trial court may impose reasonable limits on cross-examination based upon concerns about harassment, prejudice, waste of time, unnecessary duplication of testimony, confusion of issues, or interrogation that is repetitive or only marginally relevant. *Billett v. State*, 317 Ark. 346, 877 S.W.2d 913 (1994). Moreover, at the time Reed gave his testimony, there was no offer by the State to reduce his sentence, which Reed understood. In contrast, when the admitted accomplice in *Henderson v. State*, 279 Ark. 435, 652 S.W.2d 16 (1983), took the stand, he had a

plea deal with the State. Appellant's reliance on the *Henderson* case is therefore misplaced. Accordingly, we conclude that the circuit court did not abuse its discretion in imposing a limit on Appellant's cross-examination of Reed about the history of his prior guilty-plea deal.

### III. *Mariah Powell's Status as an Accomplice*

■ For his next point on appeal, Appellant claims that the circuit court erred in refusing to declare Mariah Powell an accomplice as a matter of law. In support of this claim, he asserts that the evidence conclusively shows that Mariah Powell was an accomplice to the kidnapping and murder of Monte and Sean Johnson. Specifically, Appellant points to the following facts: (1) Mariah knew that Reed wanted to "beat up" Monte Johnson and she aided Reed by taking Monte and Sean Johnson to the Reck Road house without telling them that Reed would be there; (2) Mariah further aided Reed by leading the two men into the house where the defendants were waiting to attack them; (3) Mariah was present when the crime occurred and her opportunity and association with Reed were relevant facts in determining her connection with the crime; (4) when Mariah was first questioned by the police, she denied any involvement in the kidnapping and murder of the Johnsons; and (5) Mariah fled with Reed to avoid arrest.

■ Appellant bears the burden of proving that a witness is an accomplice whose testimony must be corroborated. *Bush v. State, supra.* A defendant must either have the trial court declare a witness to be an accomplice as a matter of law or submit the issue to the jury for determination. *Price v. State,* 365 Ark. 25, 223 S.W.3d 817 (2006). The law is well settled that a witness's status as an accomplice is

a mixed question of law and fact. *McGehee v. State,* 348 Ark. 395, 72 S.W.3d 867 (2002). However, when the facts show conclusively that the witness is an accomplice, the issue may be decided as a matter of law. *Id.* When the accomplice status instead presents issues of facts, the question is submitted to the jury. *Id.*

■ According to Ark.Code Ann. § 5-2-403, an accomplice is defined as follows:

(a) A person is an accomplice of another person in the commission of an offense if, with the purpose of promoting or facilitating the commission of an offense, the person:

(1) Solicits, advises, encourages, or coerces the other person to commit the offense;

(2) Aids, agrees to aid, or attempts to aid the other person in planning or committing the offense; or

(3) Having a legal duty to prevent the commission of the offense, fails to make a proper effort to prevent the commission of the offense.

(b) When causing a particular result is an element of an offense, a person is an accomplice of another person in the commission of that offense if, acting with respect to that particular result with the kind of culpable mental state sufficient for the commission of the offense, the person:

(1) Solicits, advises, encourages, or coerces the other person to engage in the conduct causing the particular result;

(2) Aids, agrees to aid, or attempts to aid the other person to engage in the conduct causing the particular result;

(3) Having a legal duty to prevent the conduct causing the particular result, fails to make a proper effort to prevent

the conduct causing the particular result.

Ark.Code Ann. § 5–2–403 (Repl.2006). The term "accomplice" cannot be used in a loose or popular sense so as to embrace one who has guilty knowledge, or is morally delinquent, or who was even an admitted participant in a related, but distinct offense. *McGehee v. State*, 348 Ark. 395, 72 S.W.3d 867 (2002). To constitute one an accomplice, he must take some part, perform some act, or owe some duty to the person in danger that makes it incumbent on him to prevent the commission of the crime. *Id.* Mere presence, acquiescence, or silence, in the absence of a duty to act, is not enough, however reprehensible it may be, to constitute one an accomplice. *Id.* The knowledge that a crime is being or is about to be committed cannot be said to constitute one an accomplice. Nor can the concealment of knowledge, or the mere failure to inform the officers of the law when one has learned of the commission of a crime. *Id.* Presence at the crime scene does not make one an accomplice as a matter of law. *Id.* Relevant factors in determining the connection of an accomplice to a crime are the presence of the accused in proximity of a crime, the opportunity to commit the crime, and an association with a person involved in a manner suggestive of joint participation. *Id.* A defendant is an accomplice so long as the defendant renders the requisite aid or encouragement to the principal with regard to the offense at issue, irrespective of the fact that defendant was not present at the murder scene and did not directly commit the murder. *Id.*

As stated earlier, "kidnapping" is defined in Ark.Code Ann. § 5–11–102 as follows: "A person commits the offense of kidnapping if, without consent, the person restrains another person so as to interfere substantially with the other person's liberty with the purpose of ... (3) Facilitating the commission of any felony or flight after the felony; (4) Inflicting physical injury upon the other person...." Ark.Code Ann. § 5–11–102 (Repl.2006). "Capital murder" is defined in Ark.Code Ann. § 5–10–101 as follows: "A person commits capital murder if ... (4) With the premeditated and deliberated purpose of causing the death of another person, the person causes the death of any person ...." Ark.Code Ann. § 5–10–101 (Repl.2006). The particular result of the offense of kidnapping— "interfering substantially" with another person's liberty—is an element of that offense. Similarly, an element of the offense of capital murder is "causing the death" of another person. An accomplice must have acted with respect to those particular results with the kind of culpable mental state sufficient for the commission of the offenses. Ark.Code Ann. § 5–2–403(b). Based upon the record before us, we cannot say the evidence conclusively shows that Mariah Powell had the culpable mental state sufficient to commit the offenses of capital murder and kidnapping. Both parties agree that Mariah knew Reed was going to "beat up" Monte Johnson. However, the evidence does not conclusively show that Mariah intended to cause the kidnapping and death of Monte Johnson or Sean Johnson. According to Mariah's testimony, she only thought Reed would "beat up" Monte Johnson, and she did not intend to cause the death of anyone.[1] She further

---

1. In refuting the State's argument that Mariah only contemplated that her actions would result in Monte being beaten up by Reed, Appellant cites the cases of *Henry v. State*, 151 Ark. 620, 237 S.W. 454 (1922); *Clark v. State*, 169 Ark. 717, 276 S.W. 849 (1925); and *Bosnick v. State*, 248 Ark. 846, 454 S.W.2d 311 (1970), for the proposition that "[e]ach person is responsible for everything done which followed directly and immediately in the execu-

testified that she was shocked and frightened by the sudden appearance of two armed men in her bedroom at the Reck Road house. The testimony of Latifah Johnson and Tiffany Hammonds corroborated Mariah's state of fear and panic immediately following the confrontation inside the house. Tiffany stated that she had never heard Mariah sound so frightened. Reed also testified that the plan to kidnap and murder the Johnsons arose after Mariah left the house. Moreover, the evidence that Reed and the other defendants repeatedly called Mariah and told her not to call the police belies Appellant's contention that she was an accomplice as a matter of law. Lastly, Mariah's presence at the Reck Road house and her association with Reed are relevant but not conclusive facts in determining the issue of her status as an accomplice. The credibility of witnesses is an issue for the jury and not the court. *Phillips v. State*, 344 Ark. 453, 40 S.W.3d 778 (2001). The weight to be given to the testimony and all reasonable inferences to be drawn therefrom were questions for the jury to determine. *Reynolds v. State*, 211 Ark. 383, 200 S.W.2d 806 (1947). We therefore cannot say that the circuit court erred in submitting the issue of Mariah Powell's status as an accomplice to the jury.

IV. *Mere Presence Jury Instruction— AMI Criminal 2d 404*

The circuit court instructed the jury in accordance with AMI Criminal 2d 404: "Mere presence, acquiescence, silence or knowledge that a crime is being committed in the absence of a legal duty to act is not sufficient to make one an accomplice. Therefore if you find that Mariah Powell was only present while a crime was being

tion of the common purpose as one of its probable and natural consequences." Those cases, however, involved felony-murder charges where the common purpose was re-

committed and did not have a legal duty to act then she is not an accomplice." Appellant objected to the court's decision to give the "mere presence" instruction and now challenges that ruling.

A trial court's ruling on whether to submit a jury instruction will not be reversed absent an abuse of discretion. *Grillot v. State*, 353 Ark. 294, 107 S.W.3d 136 (2003). In reviewing the propriety of giving a jury instruction, the issue is not one of sufficiency, but rather, the issue is whether the slightest evidence supports the instruction. *Id.*

Appellant alleges that Mariah was not just an innocent bystander; rather, she was an active participant who lured the Johnsons to the Reck Road house knowing that Reed was going to beat up the Johnsons and that Appellant and Williams had guns. The record does not reflect that Mariah knew the men would be armed. Mariah and Reed both testified that she did not know Appellant and Williams would be at the house. As noted earlier, she was shocked and frightened when they appeared and both men were carrying guns. The record thus reflects evidence supporting the conclusion that Mariah was not an active participant in the kidnapping and murder of Monte Johnson and Sean Johnson. The circuit court's ruling on this point was not an abuse of discretion.

V. *Latifah Johnson's Status as an Accomplice*

The circuit court declined to submit the question of Latifah Johnson's status as an accomplice to the jury. On appeal, Appellant contends that Latifah's status as an accomplice was an issue of

lated to the underlying felony. At issue here is whether Mariah had the kind of culpable mental state sufficient for the commission of the offenses of kidnapping and murder.

fact that should have been submitted to the jury pursuant to AMI Criminal 2d 403.

 This court has repeatedly stated that if there is some evidentiary basis for a jury instruction, giving the same is appropriate. *Hickman v. State,* 372 Ark. 438, 277 S.W.3d 217 (2008). A party is entitled to an instruction if there is sufficient evidence to raise a question of fact or if there is any supporting evidence for the instruction. *Id.* There is no error in refusing to give a jury instruction where there is no basis in the evidence to support the giving of the instruction. *Id.* In determining whether the circuit court erred in refusing an instruction in a criminal trial, the test is whether the omission infects the entire trial such that the resulting conviction violates due process. *Id.*

Appellant claims that the following evidence supports the giving of a jury instruction on Latifah Johnson's status as an accomplice: (1) Latifah's fabrication of evidence when questioned by the police; (2) Latifah's close proximity to the victims, Albert Reed, Mariah Powell, and Cameron Williams; and (3) her improbable explanation as to why she did not enter the Reck Road house that night. We disagree. The cited evidence would not support a finding that Latifah was an accomplice. Indeed, no such finding could be made without engaging in pure speculation. The record is devoid of any evidence indicating that Latifah knew about the reason for bringing Monte Johnson and Sean Johnson to the Reck Road house. Likewise, there is no evidence suggesting that she knew anything about a plan to commit the offenses of kidnapping and murder. The circuit court's ruling on this point is affirmed.

## VI. *Admissibility of Police Officers' Testimony*

 At trial, Appellant objected to the introduction of testimony by the police offi-

cers who had stopped Appellant several times after the homicides. On each occasion, Appellant was driving a maroon SUV. The circuit court overruled his objection. Appellant now urges this court to reverse the circuit court's ruling on grounds that evidence of other crimes was not admissible under Ark. R. Evid. 404(b), and the State failed to demonstrate the relevance of the subsequent traffic stops.

 Relevancy of evidence is within the trial court's discretion, subject to reversal only if an abuse of discretion is demonstrated. *Kelley v. State,* 375 Ark. 483, 292 S.W.3d 297 (2009). "Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Ark. R. Evid. 401 (2008). Evidence may be relevant even though it is somewhat remote in time from the occurrence of the crime. *Teague v. State,* 328 Ark. 724, 946 S.W.2d 670 (1997). Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*

The record here reflects that Latifah Johnson saw Appellant's maroon SUV parked near the Reck Road house on the night of the murders. That same night, around midnight, Tim Mathis saw a maroon SUV at a carwash close to Hindman Park. The victims' bodies were discovered the next day in Hindman Park. The State contends, and we agree, that the police officers' testimony linking Appellant to the maroon SUV did not violate Rule 404(b) because it was not offered for the purpose of showing that he was a bad character,

nor was it offered to show a pattern of behavior; rather, it was offered to demonstrate Appellant's identity as the driver of a vehicle that was seen near both crime scenes. The evidence was relevant and not too remote in time from the commission of the crimes. Accordingly, we cannot say that the circuit court abused its discretion in admitting the testimony of the ₁₈police officers.

## VII. *Cross–Examination of Latifah Johnson*

Prior to Appellant's trial, Appellant requested that he be allowed to review Latifah Johnson's mental health evaluation that was done after she pled not guilty by reason of mental disease or defect in a juvenile proceeding. The State objected and argued that Ark.Code Ann. § 9–27–352 (Repl.2008) prohibited releasing the medical records of a juvenile. The circuit court sustained the State's objection. The circuit court also sustained the State's objection when Appellant sought to question Latifah about her statement to the detective that she was bipolar.

On appeal, Appellant alleges that, under Rules 401, 402, and 403 of Arkansas Rules of Evidence, Appellant has a wide latitude to impeach the credibility of Latifah Johnson; and within that latitude are questions as to whether she believed that she was suffering from a mental illness and what medications she was taking for that illness. Appellant argues that these questions go to the heart of Latifah's credibility as a witness and the circuit court erred in refusing to allow cross-examination about her mental health.

■■■ With regard to the disclosure of Latifah's mental health evaluation, Arkansas Code Annotated § 9–27–352(a)(4) provides, in relevant part, that "[m]edical records, psychiatric records, psychological records, and information related thereto shall remain confidential unless the juvenile's parents or legal guardian waives confidentiality in writing specifically describing the records to be disclosed between the persons listed in subdivision (c)(1) of this ₁₉section and the purpose for the disclosure." Ark.Code Ann. § 9–27–352(a)(4) (Repl.2008). Appellant does not dispute Latifah's status as a juvenile.[2] It is therefore clear that section 9–27–352 precludes the release of the mental evaluation.

■■■ In ruling that Appellant could not question Latifah about her statement that she was bipolar, the circuit court concluded that her competency was not at issue. In other words, the court determined that Latifah was competent to testify as a witness. A decision about the competency of a witness lies within the sound discretion of the trial court. *Modlin v. State*, 353 Ark. 94, 110 S.W.3d 727 (2003). This is so because the competency issue is one in which the trial judge's evaluation is particularly important due to the opportunity he or she is afforded to observe the witness and the testimony. *Id.* This court will not find an abuse of discretion in allowing a witness to testify as long as the record in the case is one upon which the trial judge could find a moral awareness of the obligation to tell the truth and an ability to observe, remember and relate facts. *Id.*

■■■ The credibility of a witness may be challenged by proving that he or she is subject to insane delusions, or that her mind and memory have become impaired by disease or other causes. *Lomax v.*

**2.** The circumstances under which disclosure is permitted under Ark.Code Ann. § 9–27– 352(c)(1) are not pertinent here.

*State*, 248 Ark. 534, 452 S.W.2d 646 (1970). In this case, Appellant presented no evidence showing that Latifah was subject to insane delusions or that her ability to perceive and remember was impaired. Thus, we conclude that the circuit court's competency ruling was not an abuse of discretion.

### VIII. Admissibility—Out-of-Court Conversation

At trial, Latifah Johnson testified about hearing a conversation between Appellant and Cameron Williams sometime after the murder. According to Latifah, Appellant had bought a .38–caliber revolver from Albert Reed, and Cameron Williams wanted to buy the gun but Appellant would not sell it to him. Appellant objected to the testimony, arguing that it violated Ark. R. Evid. 404(b).

 Appellant contends on appeal that, because Latifah Johnson did not identify who said what, her testimony was hearsay in violation of Rule 801 of the Arkansas Rules of Evidence. We decline to address this argument because Appellant raises it for the first time on appeal. *Standridge v. State*, 357 Ark. 105, 161 S.W.3d 815 (2004).

 With regard to Appellant's Rule 404(b) argument, evidence that Appellant possessed a gun similar to that used in the murder was independently relevant proof on the issue of Appellant's identity. *Bragg v. State*, 328 Ark. 613, 946 S.W.2d 654 (1997). Moreover, its probative value was not substantially outweighed by the danger of unfair prejudice. We affirm the circuit court on this point.

The record in this case has been reviewed for other reversible error pursuant to Arkansas Supreme Court Rule 4–3(h), and none has been found.

Affirmed.

HANNAH, C.J., dissents.

JIM HANNAH, Chief Justice, dissenting.

I respectfully dissent. Gilcrease was denied his constitutional right to confrontation when the circuit court refused to permit examination of witness Albert Reed for bias. The State openly argued and presented testimony from Reed that he was unbiased because he had "no deal" with the State and testified only to "square the balance sheet." Gilcrease credibly argued to the circuit court that Reed believed that by belatedly testifying against Gilcrease, Reed might yet receive the reduced sentence he lost when he violated his plea agreement. The circuit court erred in denying Gilcrease the opportunity to cross-examine Reed for bias based on his subjective belief that he might salvage his plea agreement.

The State negotiated a deal with Reed prior to the trial of accomplice Cameron Williams. The State informed Reed that if he would testify against Williams and Gilcrease, his criminal charges would be reduced from capital to first-degree murder, and the State would recommend a single sixty-year sentence to be served on the two convictions for first-degree murder. Reed agreed and testified at trial against Williams, but on February 19, 2008, at a pretrial hearing in the Gilcrease case, Reed announced he would not testify against Gilcrease. In that same hearing, the circuit court found the plea agreement breached, refused to allow Reed to withdraw his guilty pleas, and imposed two life sentences on the capital murder charges. However, Reed called the prosecution three days later, apparently recognizing the folly of his actions, and said he would testify against Gilcrease.

Reed was a critical witness. He was the only witness to the kidnapping, the trans-

port to Hindman Park, and the murders of Monte and Sean. Prior to trial, the prosecutor stated, "We cannot go forward without Mr. Reed." Reed was the witness that provided the crucial information convicting Gilcrease. Reed testified to the following critical facts:

1. Gilcrease was the person who introduced the idea of killing Monte and Sean Johnson;

2. Gilcrease ordered Monte and Sean to remove their clothes;

3. Gilcrease bound Monte and Sean with duct tape and ordered them outside;

4. Gilcrease ordered Monte and Sean into the trunk of a car;

5. Gilcrease ordered Reed to drive Monte and Sean to Hindman Park;

6. Gilcrease followed Reed as he drove Monte and Sean to their deaths;

7. At the park, Gilcrease stated, "It's got to be done";

8. Gilcrease shot Monte Johnson as he attempted to flee; and

9. Once Monte was on the ground, Gilcrease walked to him and fired multiple rounds into Monte's body.

Through Reed's testimony, Williams's role was reduced to being present, holding a gun on Monte and Sean while Gilcrease duct taped them, and shooting Sean at the park. Gilcrease was left as the planner and primary actor in the kidnapping and murders. Reed provided the only direct evidence of these critical facts. Reed's testimony may well be true, but Gilcrease had a right that the jury know of the possible bias before judging Reed's testimony.

Reed was presented to the jury as a man who had nothing to lose or gain by testifying, a man who only testified because he wanted to atone for his wrongs. The prosecution told the jury in opening

statement that Reed, although a criminal, had done all he could do to set things right. To reinforce this assertion of Reed's credibility, the prosecution told the jury that trial and sentencing were in the past for Reed, a done deal, that he had nothing to gain or lose by testifying "because his life for the most part is over. He's serving two life sentences in the Arkansas Department of Correction because he pled guilty." The jury was also told that Reed had "stepped up" and "taken responsibility."

The prosecution also told the jury that there were "no deals . . . none." Reed was presented to the jury as a man who had openly acknowledged his crimes, accepted a just punishment, and who only testified to try and make things right. The jury was told that Gilcrease's "problem" in the trial was that "Albert Reed stands to lose and gain nothing, that he's doing as much as any man can do in his situation." Reed was asked if he had any reason to lie against Gilcrease, and Reed responded, "No." Reed testified that he was testifying "so the families of Sean and Monte would know the truth about how they died." Further examination of Reed by the State reveals the extent to which the State emphasized Reed's believability because he had no hope of a deal with the State:

Q: I want to be clear that you have no deal with this judge, do you?

A: No sir, I mean, no ma'am.

Q: He sentenced you to two life sentences.

A. Two life sentences.

Q: Right. And he's never said that he's ever going to change that?

A: Haven't said that.

Q: You knew that coming in?

A: I knew that coming in.

Q: When you talked—I mean, you have an attorney, right?

A: Yes.

Q: Did your attorney make it clear to you that—

A: Made it clear to me.

Q: —the judge never said he was going to change it?

A: Made it clear to me.

. . . .

Q: You knew that when you came in today?

A: I knowed that.

Q: I mean, it be great if he did—

A: Yeah.

Q: You know there is no promise.

A: No promise. No deal.

Q: Right now you've been sentenced and you're done. You know that don't you?

A: Yes.

. . . .

Q: Do you have any reason to lie against this guy here?

R: No.

. . . .

Q: Is there anything out there?

R: No.

While Reed's hope that the circuit court might reinstate his plea agreement may seem quite unlikely, to a man who was facing two life sentences, it was likely the only hope he had. "The test is the expectation of the witness and not the actuality of a promise." *Klimas v. State,* 259 Ark. 301, 305–06, 534 S.W.2d 202, 205 (1976) (citing *State v. Little,* 87 Ariz. 295, 350 P.2d 756 (1960)); *see also Henderson v. State,* 279 Ark. 435, 438, 652 S.W.2d 16, 18 (1983). To deny Gilcrease the opportunity to cross-examine Reed on the issue was to deny him the right to confrontation provided by both the United States Constitution and the Arkansas Constitution.

The Sixth Amendment to the United States Constitution and Art. 2, § 10 of the Arkansas Constitution guarantee the right of an accused in a criminal prosecution to be confronted with the witnesses against him. The right of confrontation provides two types of protection for a criminal defendant: the right physically to face those who testify against him and the opportunity to conduct effective cross-examination. *Ridling v. State,* 348 Ark. 213, 221, 72 S.W.3d 466, 470 (2002) (quoting *Bowden v. State,* 301 Ark. 303, 308, 783 S.W.2d 842, 844 (1990)). "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska,* 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). The partiality of a witness is always relevant and subject to exploration at trial. *Id.* The denial of the right of effective cross-examination is a "constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it." *Davis,* 415 U.S. at 318, 94 S.Ct. 1105 (quoting *Smith v. Illinois,* 390 U.S. 129, 131, 88 S.Ct. 748, 19 L.Ed.2d 956 (1968) (quoting *Brookhart v. Janis,* 384 U.S. 1, 3, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966))); *see also Watson v. State,* 318 Ark. 603, 606, 887 S.W.2d 518, 519 (1994) (quoting *Klimas v. State,* 259 Ark. 301, 306, 534 S.W.2d 202, 205 (1976)) (citing *Davis, supra*); *Swinford v. State,* 85 Ark.App. 326, 331, 154 S.W.3d 262, 265 (2004). Reasonable limits may be placed on the right to cross-examine based on concerns such as "harassment, prejudice, confusion of issues, the witness' safety, or interrogation that is only marginally relevant." *Bowden v. State,* 301 Ark. 303, 309, 783 S.W.2d 842, 844 (1990) (quoting *Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). None of these factors, nor any other factors, are present in

this case that would justify limiting cross-examination on Reed's expectations of the resurrection of his plea agreement, no matter how unlikely that might be. Gilcrease had a right to full cross-examination in order to show bias. *Henderson*, 279 Ark. at 438, 652 S.W.2d at 18. "This is especially true in the case of an accomplice since his testimony is the direct evidentiary link between the defendant and the crime." *Id.*, 652 S.W.2d at 18. As noted, in this case, Reed provided the only direct evidence of the critical facts. The testimony elicited from Reed was that he had no deal and had no hope of a reduction in sentence. He agreed with the prosecutor that he would like a reduction, but that in no way revealed to the jury his hope that his plea agreement might be honored after the fact. It is quite reasonable to assume that Reed believed keeping quiet about his hope, and assuring in his testimony that there was no deal, was something he needed to do to bolster his credibility and increase the likelihood of his success.

The circuit court errantly excluded evidence of bias in the most crucial witness in the case. The exclusion of evidence of bias or possible prejudice by an accomplice is sufficient cause to reverse. *Henderson*, 279 Ark. at 440, 652 S.W.2d at 19. Gilcrease made no proffer, but "[a] proffer was not necessary." *Id.*, 652 S.W.2d at 19. Justice and the credibility of our criminal law requires that this case be reversed and remanded.